KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
2818 La Cienega Avenue
Los Angeles, California 90034
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: KJM@LNBYG.COM
Counsel to Todd A. Frealy, solely in his capacity as Chapter 11 Trustee

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>DEDICATION & EVERLASTING LOVE TO ANIMALS dba D.E.L.T.A. Rescue,<br><br>                     Debtor. | Case No.: 2:25-bk-13881-NB<br><br>Chapter 11<br><br>**CHAPTER 11 TRUSTEE'S MOTION FOR ENTRY OF AN ORDER: (I) APPROVING COMPROMISE OF CONTROVERSIES AND SETTLEMENT AGREEMENT PURSUANT TO RULE 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND (II) AUTHORIZING TRUSTEE TO LIQUIDATE ADDITIONAL INVESTMENTS IN ORDER TO FUND SETTLEMENT PAYMENTS; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF TODD A. FREALY IN SUPPORT THEREOF**<br><br>Date:    June 2, 2026<br>Time:   1:00 p.m.<br>Place:  Courtroom 1545<br>          255 E. Temple Street<br>          Los Angeles, CA 90012 |

Pursuant to Sections 105, 345 and 363(b) of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended, the "Bankruptcy Code") and Rules 4001(d), 9014 and 9019 of the Federal Rules of

Bankruptcy Procedure, Todd A. Frealy solely in his capacity as Chapter 11 trustee (the "Trustee") of the bankruptcy estate of debtor Dedication & Everlasting Love To Animals dba D.E.L.T.A. Rescue (the "Debtor"), hereby moves, for the entry of an order:

1. Approving the compromise of controversies, and that certain *Settlement And Release Agreement* (the "Agreement") between the Trustee and Adriana Duarte Valentines ("Valentines" or the "Judgment Creditor"), a true and correct copy of which is attached as **Exhibit 1** tot the annexed Declaration of Todd A. Frealy.

2. Authorizing the Trustee to liquidate additional investments in the estate's investment accounts at Merrill Lynch (the "Investment Accounts") so that the Trustee can convert certain securities into cash in order to fund payments required to be made by the estate under the Agreement; and

3. Authorizing the Trustee to make payments to the Judgment Creditor in accordance with the Agreement using estate assets.

The Agreement is the product of intensive, arms-length negotiations by and between the Trustee and the Judgment Creditor, pursuant to a Court-ordered mediation between the Trustee and the Judgment Creditor which occurred on April 13, 2026, with the Honorable Robert F. Kwan, United States Bankruptcy Judge (Ret.), serving as the mediator.  The primary terms of the Agreement are based on the Trustee's and the Judgment Creditor's consent to a "mediator's proposal" after an entire day of mediation and settlement negotiations.  The Agreement constitutes, in the Trustee's opinion and business judgment, the most effective and efficient manner of resolving the largest and most significant claim against the Debtor's estate, which, ultimately, will lead to and result in the payment of all allowed claims in full in this case, and facilitate the ongoing viability of the Debtor's non-profit operations.  The Agreement will resolve all pending disputes between the Trustee and the Judgment Creditor, including the appeal of the Judgment Creditor's judgment and issues and disputes pertaining to the allowance and liquidation of the Judgment Creditor's judgment claim and attorneys' fees claim.  Pursuant to the Agreement, the asserted claims of the Judgment Creditor, in the amount of more than $7.3 million (and growing due to the incurrence of additional interest on the judgment claim at a rate of 10% per annum, and potentially additional attorneys' fees and costs), will be satisfied in full by payment of $5.5 million in total, $726,000 of which will be

funded by the Debtor's insurer Nonprofits Insurance Alliance of California ("NIAC") (which has agreed to fund such amount) which amount NIAC will pay directly to the estate).

The Trustee believes that under the circumstances, the Agreement places this estate on a path to ensuring that all creditors' claims are satisfied without continuing to embroil this estate in time consuming appeal litigation that appears to have little chance of success, and that leaves the estate with sufficient assets to continue to be able to fund operations and continue to provide for the rescued animals in the estate's care.

In order to fund payments to the Judgment Creditor under the terms of the Agreement, the Trustee will need authority to liquidate additional securities and investments in the estate's two Merrill Lynch investment accounts. Pursuant to this Motion, the Trustee seeks authority to liquidate sufficient securities to make all required payments to the Judgment Creditor under the Agreement (to the extent the Agreement is approved by the Court). The Trustee has commenced discussions with Merrill Lynch personnel to develop a potential securities liquidation strategy to ensure that the estate can liquidate sufficient investments to raise at least $3.3 million (net, after costs and commissions[1]) in connection with the initial $4 million payment to be made to the Judgment Creditor under the terms of the Agreement. The Trustee seeks Court authority to liquidate securities/investments in order to fund all payments under the Agreement.

For the reasons stated herein and discussed in further detail below, the Trustee respectfully requests that the Court enter an order:

1. Granting the Motion;

2. Approving the Agreement;

3. Authorizing the Trustee to take any and all actions necessary to effectuate and enforce the Agreement;

4. Authorizing the Trustee to liquidate securities and investments in the Merrill Lynch accounts to fund any and all payments to the Judgment Creditor under the Agreement; and

---

[1] Costs and commissions in connection with the sale of stocks is 1.5%, and costs and commissions in connection with the sale of commodities is 1%. There is no cost or commission in connection with the sale of mutual funds.

3

5.    Granting such further relief as the Court deems just and proper.

Dated: May 12, 2026                          TODD A. FREALY, CHAPTER 11 TRUSTEE


                                             By:  */s/ Krikor J. Meshefejian*
                                                  KRIKOR J. MESHEFEJIAN
                                                  LEVENE, NEALE, BENDER, YOO
                                                     & GOLUBCHIK L.L.P.
                                                  Counsel for Chapter 11 Trustee

4

**TABLE OF CONTENTS**

I.    STATEMENT OF FACTS.................................................................................1

II.    THE SETTLEMENT AGREEMENT SHOULD BE APPROVED............................12
    A.    The Probability Of Success In The Litigation. ........................................13
    B.    The Difficulties, If Any, To Be Encountered In The Matter Of Collection. .........14
    C.    The Complexity Of The Litigation Involved, And The Expense, Inconvenience, And Delay Necessarily Attending It. ................................................14
    D.    The Paramount Interest Of The Creditors And A Proper Deference To Their Reasonable Views. ...............................................14

III.    THE TRUSTEE SHOULD BE AUTHORIZED TO LIQUIDATE INVESTMENTS IN THE INVESTMENT ACCOUNTS TO FUND SETTLEMENT PAYMENTS ...15

III.    CONCLUSION .................................................................................16

DECLARATION OF TODD A. FREALY ...............................................................17

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Blair,*
538 F.2d 849 (9th Cir. 1976) ...............................................................................................13

*Matter of Carla Leather, Inc.,*
44 B.R. 457 (Bankr. S.D. N.Y. 1984)...................................................................................13

*Carson*,
82 B.R. 847 ............................................................................................................................12

*Hydronic Enterprise, Inc.,*
58 B.R. 363 (Bankr. D. R.I. 1986)........................................................................................12

*Knowles v. Putterbaugh (In re Hallet),*
33 B.R. 564 (Bankr. D. Me. 1983).......................................................................................12

*Lee Way Holding Co.,*
120 B.R. 881 (Bankr. S.D. Ohio 1990)................................................................................13

*Martin v. Kane (In re A & C Properties),*
784 F.2d 1377 (9th Cir. 1986), *cert. denied* 479 U.S. 854 (1986).........................................12

*Mobile Air Drilling Co., Inc.,*
53 B.R. 605 (Bankr. N.D. Ohio 1985)..................................................................................12

*Newman v. Stein*,
464 F.2d 689 (2nd Cir. 1972)................................................................................................13

*United States v. Alaska National Bank (In re Walsh Constr., Inc.),*
669 F.2d 1325 (9th Cir. 1982) .........................................................................................12, 13

*W.T. Grant & Co.*,
699 F.2d 599 (2nd Cir. 1983)................................................................................................13

*Walter*,
83 B.R. 14 (9th Cir. B.A.P. 1988).........................................................................................15

*Woodson v. Fireman's Fund Ins. Co. (In re Woodson)*,
839 F.2d 610 (9th Cir. 1988) ................................................................................................12

**Federal Statutes**

18 U.S.C.
§ 1201(d)..................................................................................................................................2

Bankruptcy Code Chapter 11................................................................................................1, 3

**California Statutes**

California Civil Code
§ 1542................................................................................................................................10

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.     STATEMENT OF FACTS

1.      The Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code on May 9, 2025 (the "Petition Date").  On May 16, 2025, (1) the Court ordered the appointment of a chapter 11 trustee; (2) the Office of United States Trustee appointed Mr. Frealy as the Trustee; and (3) the Court entered an order approving the appointment of Mr. Frealy as the Trustee.

2.      The Debtor is a non-profit organization that operates an animal rescue facility located in Acton, California (and the Debtor may have similar operations in other locations either owned or rented by the Debtor).  The Debtor advertises that it is "the largest 'No Kill, Care-for-Life,' Animal Sanctuary of its kind in the world. *See* https://www.deltarescue.org.

3.      Virtually all of the Debtor's revenue appears to derive from donations made to the Debtor by third parties.  The Debtor also appears to be generating revenue in the form of dividends from investments in various securities.  The Debtor receives potentially hundreds of thousands of dollars of donations per month.  As of April 30, 2026, the Debtor's investment accounts with Merrill Lynch were holding approximately $14,498,290 million in securities investments (though that value may fluctuate depending on market conditions and investment performance).  Additionally, the Trustee's investigation has revealed that the Debtor owns a number of pieces of real estate, which appear to be unencumbered (except potentially by a judgment lien).

4.      The Trustee understands that the Debtor filed this bankruptcy case as a result of a judgment obtained by a former employee of the Debtor – Adriana Duarte Valentines (the "Judgment Creditor") – against the Debtor, in the amended amount of $2,896,952, entered on March 19, 2025, and collection efforts thereon by the Judgment Creditor. Additionally, the Judgment Creditor's state court counsel filed, prior to the Petition Date, a motion for attorney's fees and costs, requesting an attorney fee and cost award of more than $4 million.  Prior to the Petition Date, on March 31, 2025, the Judgment Creditor filed a Notice of Judgment Lien with the California Secretary of State, and on April 28, 2025, the State Court issued a writ of execution in favor of the Judgment Creditor, in the amount of $2,925,564.68.  Thereafter, on or around

May 2, 2025, notices of levy appeared to have been served on various financial institutions, including U.S. Bank and Merrill Lynch.

5.      The creditor body in this case other than the Judgment Creditor, is comprised primarily of vendors, independent contractors, and service providers whose claims are for goods and services provided immediately before the Petition Date, but whose claims were not paid as a result of freezes placed on the Debtor's bank accounts due to either the Judgment Creditor's collection efforts or the Debtor's bankruptcy filing, or a combination of both, and certain state agencies.  The total amount of claims other than the Judgment Creditor's claims that were scheduled by the Debtor or asserted in filed proofs of claim equals approximately $470,000.

6.      This estate appears to be a solvent estate, and the Trustee continues to manage and operate the Debtor's animal rescue facility with the assistance of the Debtor's employees, including the Debtor's Secretary Erica Grillo.  Animals continue to receive care and the estate continues to receive donations for the time being, though as the Trustee has discussed in prior filings, donations have trended downward over the past numerous months.  Additionally, on March 3, 2026, a criminal complaint was filed against the Debtor's principle Leo Grillo in the United States District Court for the Central District of California, Case No. 2:26-cr-00146-GW, under 18 U.S.C. § 1201(d), for the attempting kidnapping of the Judgment Creditor.  This shocking news has resulted in the confinement of Mr. Grillo who remains in custody pending his criminal trial, which is presently set to commence on October 27, 2026.  Such events, which have been highly publicized (https://www.latimes.com/california/story/2026-03-04/nonprofit-owed-millions-alleged-kidnapping-plot).  Nevertheless, the estate continues to remain solvent as a result of the significant investments held by the estate, which as of April 30, 2026 had a value of approximately $14,498,290.

7.      In connection with the Debtor's pre-petition appeal of the Judgment Creditor's amended judgment, after the Petition Date, the Trustee filed an application to employ the law firm of Kaufman Dolowich LLP ("Appellate Counsel") to serve as the estate's appellate counsel in connection with the pending appeal of the judgment obtained by the Judgment Creditor.  Appellate Counsel has provided to the Trustee its analysis of the merits of the appeal.

2

8.      On September 19, 2025, the Judgment Creditor filed a proof of claim, designated as Claim 6-1 on the Bankruptcy Court's claim register, asserting a secured claim in the amount of $3,041,402.76, the basis of which is the judgment (the "Judgment Claim").

9.      Also on September 19, 2025, the Judgment Creditor filed a proof of claim, designated as Claim 7-1 on the Bankruptcy Court's claim register, asserting a general unsecured claim in the amount of $4,259,719.92, the basis of which is the Fee Motion (the "Attorney Fee Claim" and together with the Judgment Claim, the "Alleged Claims").

10.      On March 2, 2016, the Trustee and the Judgment Creditor entered into that certain *Stipulation Between Chapter 11 Trustee And Judgment Creditor Adriana Duarte Valentines To Appoint The Honorable Robert N. Kwan As Mediator For Resolution Of Judgment Creditor's Claims* [Bankruptcy Case docket number 219], and on March 4, 2026, the Bankruptcy Court entered that certain *Order Assigning Matter To Mediation Program And Appointing Mediator And Alternate Mediator* [Bankruptcy Case docket number 226].

11.      The Trustee evaluated the state court proceedings that led to the judgment, the issues and disputes relevant to the appeal, and the Attorney Fee Claim, and the status of this case, in connection with participating in the mediation and reaching a settlement with the Judgment Creditor.  In the state court proceedings, the special verdict form attached to the judgment shows that the 12-person jury unanimously ruled against the Debtor on the overwhelming majority of the 66 questions submitted to the jury.  On November 4, 2024, the jury returned a verdict for the Judgment Creditor with a 12-0 vote on nearly every question on the form.  The jury ruled 0-12 against the Debtor on its same decision affirmative defense.  The only issues on which the Debtor prevailed by a 2-10 vote were failure to grant pregnancy disability leave and failure to reinstate from pregnancy disability leave.

12.      The original Phase 1 verdict was for $180,950.00 in economic damages, $5,000,000.00 in past noneconomic damages, and $500,000.00 in future noneconomic monetary damages, for total monetary damages of $5,680,950.00.  The trial court denied in part and granted in part a motion for new trial unless the Judgment Creditor agreed to a reduction in excessive noneconomic damages from $5.6 million to $1,7 million.  On the same form, the jury found that Leo Grillo (the Debtor's principal) engaged in conduct with

3

malice, oppressions, or fraud and was acting on behalf of the Debtor.  This triggered a Phase 2 punitive damages trial.  On November 5, 2024, the jury returned a verdict of $1 million in punitive damages.

13.    In the state court proceedings, the Judgment Creditor claimed that the Debtor engaged in various forms of discrimination, including sex, gender, pregnancy and/or national origin discrimination. The Judgment Creditor prevailed against the Debtor in connection with such claims, and it appears to the Trustee that the Judgment Creditor prevailed, at least in part, as a result of certain statements made by Leo Grillo during his deposition, which the Debtor unsuccessfully sought to exclude from evidence as irrelevant and unduly prejudicial, including, insinuating that because the Judgment Creditor is a woman, she should already know that a Cesarean section will result in a hospital stay, referring to the Judgment Creditor as a "lettuce picker" and a "bimbo" and making statements such as "I don't speak Mexican." ."  While Mr. Grillo disagrees with the manner in which the context and intent of his statements was presented to the jury, the Trustee's analysis of the issues on appeal is that the appellate court is unlikely to reverse evidentiary rulings allowing such deposition testimony to be presented at trial that Mr. Grillo's deposition testimony was likely properly admitted and likely led the jury to weigh the evidence in favor of the Judgment Creditor.

14.    The Debtor's position at trial was that the Debtor properly terminated the Judgment Creditor's employment in good faith for two legitimate reasons.  First, the Debtor claimed that the Judgment Creditor stole pet supplies from the Debtor, and second, the Debtor claimed that the Judgment Creditor deliberately concealed her pregnancy from the Debtor, asked for time off for a short hospital stay, and belatedly revealed her pregnancy to the Debtor only after the fact because she ended up having an unexpected Caesarean section and needed more time off.  However, no hard evidence of theft appears to have been presented, apart from Mr. Grillo's suspicions, so citing that as a basis for termination likely looked to the jury like the Debtor was searching for a pretext to terminate the Judgment Creditor. Additionally, the Debtor appears to have been unable to provide any evidence that the Judgment Creditor was obligated to report a pregnancy to the Debtor.  The Trustee's analysis is that the estate faces a difficult battle attempting to prove on appeal that the jury verdict was based on bias and unfairness in the trial proceedings or that there was an error at the trial court likely to result in a reversal of the judgment.

4

15.    The Trustee has also evaluated the attorney fee claims of the Judgment Creditor and believes t that it is likely that the attorneys' fees would be reduced in connection with liquidation of the Attorney Fee Claim of the Judgment Creditor.  To the extent the parties did not settle, the Trustee would object to the Attorney Fee Claim, and there would likely be a dispute regarding which court should liquidate that claim, and the allowed amount of that claim.  However, such litigation would likely result in additional costs and delay in the administration of this case and there would be the risk that the Trustee would not prevail in such disputes.  In any event, the settlement reached by the Trustee and the Judgment Creditor takes into account a reduction of the alleged claims of the Judgment Creditor, from a total of $7.3 million to $5.5 million, which the Trustee believes takes into account the low probability of success in the appeal and the higher probability of successfully reducing the attorneys' fees claimed by the Judgment Creditor.

16.    On April 13, 2026, the Trustee and the Judgment Creditor participated in a mediation with the Honorable Robert N. Kwan serving as mediator.  The Debtor's insurance carrier Nonprofits Insurance Alliance of California also attended and participated in the mediation.

17.    Considering the risks and costs involved in continued litigation (including those concerning the Alleged Claims, the Bankruptcy Case, the Fee Motion and the Appeal), the Trustee and the Judgment Creditor have agreed to resolve all disputes between the Estate and the Judgment Creditor, including, without limitation, the Alleged Claims that were, or could have been, asserted in the Valentines Lawsuit, the appeal, or the bankruptcy case, on terms mutually acceptable to each party pursuant to a mediator's proposal accepted by both parties on April 13, 2026.

18.    The Agreement is the product of intensive, arms-length negotiations by and between the Trustee and the Judgment Creditor, pursuant to a Court-ordered mediation between the Trustee and the Judgment Creditor which occurred on April 13, 2026, with the Honorable Robert F. Kwan, United States Bankruptcy Judge (Ret.), serving as the mediator.  The Agreement constitutes, in the Trustee's opinion and business judgment, the most effective and efficient manner of resolving the largest and most significant claim against the Debtor's estate, which, ultimately, will lead to and result in the payment of all allowed claims in full in this case, and facilitate the ongoing viability of the Debtor's non-profit operations.  The Agreement will resolve all pending disputes between the Trustee and the Judgment Creditor, including the

appeal of the Judgment Creditor's judgment and issues and disputes pertaining to the allowance and liquidation of the Judgment Creditor's judgment claim and attorneys' fees claim. Pursuant to the Agreement, the asserted claims of the Judgment Creditor, in the amount of more than $7.3 million (and growing due to the incurrence of additional interest on the judgment claim at a rate of 10% per annum, and potentially additional attorneys' fees and costs), will be satisfied in full by payment of $5.5 million in total, $726,000 of which will be funded by the Debtor's insurer Nonprofits Insurance Alliance of California ("NIAC") (which has agreed to fund such amount) which amount NIAC will pay directly to the estate).

19. The Trustee believes that under the circumstances, the Agreement places this estate on a path to ensuring that all creditors' claims are satisfied without continuing to embroil this estate in time consuming appeal litigation that appears to have little chance of success, and that leaves the estate with sufficient assets to continue to be able to fund operations and continue to provide for the rescued animals in the estate's care.

20. Subsequent to the mediation, the Trustee and the Judgment Creditor negotiated and executed that certain *Settlement And Release Agreement* (the "Agreement"), a true and correct copy of which is attached as **Exhibit 1** to the annexed Declaration of Todd A. Frealy.

21. The salient terms of the Agreement[1] are as follows:

Purpose of Agreement. The Agreement is entered into in good faith for the purpose of settling all disputes between the Judgment Creditor and the Debtor with respect to all claims brought or that could have been brought in the Valentines Lawsuit, the Bankruptcy Case, or the Appeal, including, without limitation, the Alleged Claims, and to also resolve any other remaining disputes relating to the Valentines Lawsuit or the Bankruptcy Case, including the Fee Motion and the Appeal.

Condition to Effectiveness of Agreement. The Agreement is subject to the approval of the Bankruptcy Court and shall not be effective until entry by the Bankruptcy Court of a final, non-

---

1. [1] To the extent there is any discrepancy between the Agreement and this summary, the Agreement shall govern. Capitalized terms not otherwise defined herein have the same meaning provided to such terms in the Agreement.

6

appealable order (the "Final Order"), with the date on which there is a Final Order being the effective date of this Agreement (the "Effective Date").  The Trustee shall file with the Court a motion pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure in the Bankruptcy Case for an order approving the Agreement.  In the event that the Court does not approve the Agreement pursuant to a Final Order, except as provided for in the Agreement, the Agreement shall be null and void and of no force or effect.  In the event that any party timely perfects an appeal of the entry of the Bankruptcy Court's order approving this settlement, the Effective Date shall be tolled until ten (10) days after such appeal is resolved and the appealed order becomes a Final Order.

Initial Payment By Debtor's Estate To Judgment Creditor.  In full settlement and satisfaction of the Alleged Claims, and any other claims and causes of action of the Judgment Creditor against the Estate, the Estate shall pay to the Judgment Creditor in accordance with this Agreement and subject to the entry of a Final Order, payments totaling the sum of five-million five-hundred thousand dollars ($5,500,000) (the "Settlement Amount"), as follows: An initial payment shall be made by the Estate to the Judgment Creditor in the amount of four-million dollars ($4,000,000) (the "Initial Payment") within 10 days after the Effective Date. The Debtor's insurer, Nonprofits Insurance Alliance of California ("NIAC"), who has been tendering defense costs for the Debtor in connection with the Valentines Lawsuit, shall pay to the Estate the remaining policy limits of seven-hundred twenty-six thousand dollars ($726,000) within 30 days of the entry of a Final Order. If the Effective Date is tolled due to an appeal of the Bankruptcy Court's order approving the Agreement, then the Initial Payment amount shall accrue simple interest in the amount of 5% per annum until the order becomes a Final Order.  If any interest on the Initial Payment is earned due to an appeal, the Trustee and Judgment Creditor shall meet and confer to confirm the interest amount and that interest shall be added to the Initial Payment made by the Estate to the Judgment Creditor as and to the extent the appealed order becomes a Final Order.

Subsequent Installment Payments By Debtor's Estate To Judgment Creditor.  The remaining one-million, five-hundred thousand dollars ($1,500,000) of the Settlement Amount shall be paid by the Estate to the Judgment Creditor by wire to Levin & Nalbandyan, LLP Client Trust Account in eight (8) quarterly installments (the "Installment Payments"), provided, however, that the Trustee may cause the Installment Payments to be paid earlier without any pre-payment penalty. Wire instructions shall be provided to counsel for the Estate by counsel for Judgment Creditor in advance of the due date. Each of the Installment Payments shall total at least one-hundred eighty-seven thousand, five-hundred dollars ($187,500).  The Installment Payments shall commence on the 90th day after the Initial Payment is made and shall continue quarterly thereafter until the entire Settlement Amount is paid to the Judgment Creditor.  Notwithstanding any of the above, the Trustee shall have the right, in his sole discretion, to pay any remaining portion of the Settlement Amount to Judgment Creditor at any time after the Effective Date without any prepayment penalty.  Any plan of reorganization proposed by the Trustee shall incorporate the terms of the Agreement and shall provide for the treatment of the Alleged Claims of the Judgment Creditor as set forth in this Agreement, and Judgment Creditor shall support and vote in favor of any such plan of reorganization proposed by the Trustee, provided, however, that nothing set forth in the Agreement shall require the Trustee to propose or confirm a plan of reorganization in the Bankruptcy Case. The Trustee may place the entirety of the Alleged Claims in a single class under any such plan, or, alternatively, the Trustee may place the Judgment Claim in a separate, secured creditor, class, and the Attorney Fee Claim in a class with other general unsecured claims.

Default, Notice and Cure.  The Estate shall have a fourteen (14) day grace period ("Grace Period") after the due date of each Installment Payment within which it may make the above referenced Installment Payment prior to the Judgment Creditor sending a notice of default ("NOD") letter via email and regular mail to the Debtor and to the Trustee and his counsel.  If after the Grace Period the Estate has failed to make the Installment Payment noted above, the Estate shall be considered to be in default.  Notwithstanding any default, the Estate shall have the right to cure any default by

paying the first delinquent payment and any subsequent payments that have come due in full without acceleration.  If the default remains uncured after the NOD, the unpaid and past due Installment Payment shall begin to earn interest as of the date of the NOD at the rate of 10% per annum, simple interest, until the Settlement Amount is fully paid (with interest).

Cooperation with the Trustee.  Judgment Creditor and her counsel represent and warrant that they will continue to, in general, cooperate with the Trustee and the Estate in a reasonable manner.

Dismissal of Proceedings.  Within five (5) business days following the Judgment Creditor's receipt of the Initial Payment, the Judgment Creditor shall file with all appropriate Courts a stipulation to dismiss the Appeal with prejudice.  Within ten (10) business days following Judgment Creditor's receipt of the final Installment Payment as set forth above, Judgment Creditor shall file with all appropriate Courts an Acknowledgment of Satisfaction of Judgment.  To the extent applicable, Judgment Creditor shall also cause an Acknowledgment of Satisfaction of Judgment to be recorded with any recording authority where Judgment Creditor recorded a notice of judgment, writ of execution, an abstract of judgment, and/or any other similar document evidencing the judgment obtained by Judgment Creditor in the Valentines Lawsuit.  Upon full satisfaction of the Settlement Amount, Judgment Creditor shall be deemed to have released any and all liens, encumbrances and security interests against any and all property of the Debtor and its Estate.

Releases.  Except as otherwise provided in the Agreement, upon execution of the Agreement and payment of the Settlement Amount to the Judgment Creditor, the Judgment Creditor, on behalf of herself and her respective predecessors, successors, heirs, and assigns, does hereby release, remise, and discharge the Trustee, the Debtor, the Estate, and all of their respective donors, members, shareholders, directors, officers, employees, agents, attorneys, successors, and assigns from any and all claims, demands, debts, liabilities, contracts, obligations, accounts, torts, causes of action, or claims for relief arising from or related to the Valentines Lawsuit, the Fee Motion or the

Bankruptcy Case, whether known or unknown or suspected or unsuspected by these releasing parties, or any of them, which these same releasing parties may have, claim to have, or have at anytime heretofore had or claimed to have had, or that may hereafter accrue against any of these released parties by reason of any transaction, occurrence, act, or omission prior to the execution of this Agreement.  For the avoidance of doubt, this release does not extend to any claims Judgment Creditor may have against any individuals by virtue of any criminal actions those individuals may have taken against Judgment Creditor whether or not any individual purports to have done so on behalf of the Debtor or the Estate.

The Trustee and the Estate on behalf of themselves and their successors and assigns, do hereby release, remise, and discharge the Judgment Creditor and her successors and assigns, from any and all claims, demands, debts, liabilities, contracts, obligations, accounts, torts, causes of action, or claims for relief arising from or related to the Valentines Lawsuit and the Bankruptcy Case, whether known or unknown or suspected or unsuspected by these releasing parties, or any of them, which these same releasing parties may have, claim to have, or have at anytime heretofore had or claimed to have had, or that may hereafter accrue against any of these released parties by reason of any transaction, occurrence, act, or omission execution of the Agreement.

Each Party expressly waives and relinquishes any and all rights and benefits under California Civil Code section 1542, which provides:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

Each Party acknowledges that it may hereafter discover facts different from or in addition to those it now knows or believes to be true with respect to the claims released herein, and expressly agrees that this release shall be and remain effective in all respects notwithstanding the discovery of any such different or additional facts.

10

None of the releases contained in the Agreement shall extend to any insurers of any of the Parties or to any malpractice claims that the Estate may hold against its counsel in the Valentines Lawsuit. For the avoidance of doubt, the releases specifically do not extend to Debtor's insurer, NIAC, and any and all claims and causes of action of the Estate against NIAC or the Debtor's counsel in the Valentines Lawsuit are expressly preserved.

Attorney Fees and Costs. In the event any suit, action, hearing, or other proceeding is instituted to enforce or interpret any portion of the Agreement, the prevailing party shall be entitled to recovery of its costs, including its attorney's fees.

Costs. Each Party will bear its own costs, expenses, and attorneys' fees that it has heretofore incurred in connection with or arising out of the matters set forth in the Recitals hereinabove, and the matters and claims released hereunder.

22. In order to fund payments to the Judgment Creditor under the terms of the Agreement, the Trustee will need authority to liquidate additional securities and investments in the estate's two Merrill Lynch investment accounts. Pursuant to this Motion, the Trustee seeks authority to liquidate sufficient securities to make all required payments to the Judgment Creditor under the Agreement (to the extent the Agreement is approved by the Court). The Trustee has commenced discussions with Merrill Lynch personnel to develop a potential securities liquidation strategy to ensure that the estate can liquidate sufficient investments to raise at least $3.3 million (net, after costs and commissions[2]) in connection with the initial $4 million payment to be made to the Judgment Creditor under the terms of the Agreement. The Trustee seeks Court authority to liquidate securities/investments in order to fund all payments under the Agreement.

---

[2] Costs and commissions in connection with the sale of stocks is 1.5%, and costs and commissions in connection with the sale of commodities is 1%. There is no cost or commission in connection with the sale of mutual funds.

## II.   THE SETTLEMENT AGREEMENT SHOULD BE APPROVED

The authority granted a trustee to compromise a controversy or agree to a settlement is set forth in Bankruptcy Rule 9019(a), which provides in pertinent part that "[o]n motion by the trustee and after hearing on notice to creditors ..., the court may approve a compromise or settlement." The decision of whether a compromise should be accepted or rejected lies within the sound discretion of the Court. *In re Carson*, 82 B.R. 847, 852 (Bankr. S.D. Ohio 1987; *In re Hydronic Enterprise, Inc.*, 58 B.R. 363, 365 (Bankr. D. R.I. 1986); *In re Mobile Air Drilling Co., Inc.,* 53 B.R. 605, 607 (Bankr. N.D. Ohio 1985); *Knowles v. Putterbaugh (In re Hallet)*, 33 B.R. 564, 565 (Bankr. D. Me. 1983).

The Court of Appeals for the Ninth Circuit has long recognized that "[t]he bankruptcy court has great latitude in approving compromise agreements." *Woodson v. Fireman's Fund Ins. Co. (In re Woodson)*, 839 F.2d 610, 620 (9th Cir. 1988). "The purpose of a compromise agreement is to allow the trustee and the creditors to avoid the expenses and burdens associated with litigating sharply contested and dubious claims." *Martin v. Kane (In re A & C Properties)*, 784 F.2d 1377, 1380-81 (9th Cir. 1986), *cert. denied* 479 U.S. 854 (1986). Accordingly, in approving a settlement agreement, the Court need not conduct an exhaustive investigation of the claims sought to be compromised. *See United States v. Alaska National Bank (In re Walsh Constr., Inc.)*, 669 F.2d 1325, 1328 (9th Cir. 1982). Rather, it is sufficient that the Court find that the settlement was negotiated in good faith and is reasonable, fair, and equitable. *See In re A & C Properties, supra*, 784 F.2d at 1381.

The Court of Appeals for the Ninth Circuit has identified the following factors for consideration in determining whether a proposed settlement agreement is reasonable, fair, and equitable:

A.    The probability of success in the litigation;

B.    The difficulties, if any, to be encountered in the matter of collection;

C.    The complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and

D.    The paramount interest of the creditors and a proper deference to their reasonable views in the premises.

*In re A & C Properties, supra*, 784 F.2d at 1381 (the "A & C Factors").

A court should not substitute its own judgment for the judgment of the trustee. *Matter of Carla Leather, Inc.*, 44 B.R. 457, 465 (Bankr. S.D. N.Y. 1984). A court, in reviewing a proposed settlement, is not to decide the numerous questions of law and fact but rather to canvass the issues to determine whether the settlement falls below the lowest point in the range of reasonableness. *In re W.T. Grant & Co.*, 699 F.2d 599, 608 (2nd Cir. 1983), *accord*, *Newman v. Stein*, 464 F.2d 689, 693 (2nd Cir. 1972). The court should not conduct a "mini-trial" on the merits of the underlying cause of action. *Matter of Walsh Const., Inc.*, 669 F.2d 1325, 1328 (9th Cir. 1982); In re Blair, 538 F.2d 849 (9th Cir. 1976). "It is well established that compromises are favored in bankruptcy." *In re Lee Way Holding Co.*, 120 B.R. 881, 891 (Bankr. S.D. Ohio 1990). The Trustee believes that the Agreement is reasonable, fair and equitable and in the best interests of the estate. A review of the A & C Factors below supports the Court's approval of the Agreement.

**A.      The Probability Of Success In The Litigation.**

The Agreement will resolve the disputes and claims that led to the filing of this bankruptcy case and will ultimately lead to the payment in full of all allowed claims against the estate while preserving sufficient assets to ensure that operations and the care for and safety of rescued animals continue for the foreseeable future. The Trustee has analyzed the merits of the appeal with the assistance of Appellate Counsel and the Trustee does not believe that the estate is likely to prevail on appeal. While the Trustee does believe that the Attorney Fee Claim is objectionable and that there are reasons why the Attorney Fee Claim should be reduced, the Agreement, and the reduction of the Alleged Claims, from $7.3 million to $5.5 million (with $726,000 to be paid by NIAC), fairly and reasonably takes into account the probability of success in the appeal (low probability) and the probability of reduction of the Attorney Fee Claim (medium to high probability of a reduction, though low probability of a reduction in excess of $1 million).

Moreover, if there was a probability of success in the appeal, the most likely result would be a retrial, which could nevertheless expose the estate to a large claim by the Judgment Creditor that would be required to be paid, at least in part, by the estate. Moreover, such an outcome would severely delay the resolution of the bankruptcy proceedings and the payment of other creditors' claims. Given the

uncertainty and unlikelihood of success in connection with the appeal, and the material discount of the Alleged Claims, the Trustee submits that the potential success in litigation is outweighed by the certainty the Agreement provides in terms of the estate's total exposure to the Judgment Creditor's claims and the efficient resolution of this case. The Trustee believes that proceeding with litigation with the Judgment Creditor is unlikely to achieve an actual superior result to what is provided in the Agreement.

**B.    The Difficulties, If Any, To Be Encountered In The Matter Of Collection.**

The Trustee is not seeking to collect or recover any money from the Judgment Creditor. However, it is important to note that the Agreement does not result in a release of any claims of the estate against the Debtor's trial counsel or the Debtor's insurer, as all such claims are preserved.

**C.    The Complexity Of The Litigation Involved, And The Expense, Inconvenience, And Delay Necessarily Attending It.**

The appeal is complex and involves events that occurred many years ago. While the costs of the appeal are required to be funded by NIAC (without a reduction in policy limits), the administration of the appeal and the Trustee's involvement and oversight with respect to the appeal and litigation regarding the unliquidated Attorney Fee Claim will cause expense, inconvenience and delay in connection with the administration of this bankruptcy case. Absent the Agreement, the Trustee would be required to continue to oversee the appeal, and expend resources objecting to the Attorney Fee Claim. Though the Truste recognizes that the costs of Appellate Counsel, and potentially the costs of a new trial in the state court would be borne by NIAC and not the estate, the time delay in resolving the Alleged Claims could be significant, and, the Trustee and his bankruptcy counsel would be required to administer the estate while such matters remain unresolved, at a cost to the estate. The Trustee believes that the delay and inconvenience inherent in continued litigation with the Judgment Creditor weighs in favor of approval of the Agreement.

**D.    The Paramount Interest Of The Creditors And A Proper Deference To Their Reasonable Views.**

The paramount interest of the creditors is best served by the Agreement, since the Agreement will pave the way toward payment of allowed claims in full while ensuring that the Debtor retains sufficient

14

assets to continue its operations for the foreseeable future.   The Trustee's review and analysis of all of the facts of this case, coupled with his intensive discussions with parties in interest and their counsel, brought the Trustee to the conclusion that it would be a mistake for the Trustee to fail to consider alternatives to litigation and to fail to consider a resolution with the Judgment Creditor, who obtained a judgment against the Debtor pursuant to a 12-0 jury verdict.  The Trustee engaged in good faith mediation with the Honorable Robert F. Kwan serving as mediator and reached an agreement with the largest creditor of this estate after intensive negotiations in which the Trustee was able to significantly reduce the Alleged Claims of the Judgment Creditor, by nearly $2 million.

For these reasons, the Trustee submits that the Agreement serves the paramount interests of creditors and should be approved by this Court.

## III.    THE TRUSTEE SHOULD BE AUTHORIZED TO LIQUIDATE INVESTMENTS IN THE INVESTMENT ACCOUNTS TO FUND SETTLEMENT PAYMENTS

Section 363(b)(1) provides that the trustee "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate…" In *In re Walter*, 83 B.R. 14 (9th Cir. B.A.P. 1988), the Bankruptcy Appellate Panel adopted the Second Circuit's analysis for approval of transactions outside the ordinary course of business:

> We also agree with the Second Circuit that implicit in § 363(b) is the further requirement of justifying the proposed transaction.  *In re Lionel Corp.,* 722 F.2d 1063, 1071 (2d Cir.1983).  That is, for the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business....  Whether the proffered business justification is sufficient depends on the case. As the Second Circuit held in *Lionel,* the bankruptcy judge should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike.

*In re Walter*, 83 B.R. at 19.

In order to fund payments to the Judgment Creditor under the terms of the Agreement, the Trustee will need authority to liquidate additional securities and investments in the estate's two Merrill Lynch investment accounts. Pursuant to this Motion, the Trustee seeks authority to liquidate sufficient securities to make all required payments to the Judgment Creditor under the Agreement (to the extent the Agreement is approved by the Court). The Trustee has commenced discussions with Merrill Lynch personnel to develop a potential securities liquidation strategy to ensure that the estate can liquidate sufficient investments to raise at least $3.3 million (net, after costs and commissions[3]) in connection with the initial $4 million payment to be made to the Judgment Creditor under the terms of the Agreement. The Trustee seeks Court authority to liquidate securities/investments in order to fund all payments under the Agreement.

### III.   CONCLUSION

**WHEREFORE**, the Trustee respectfully requests that the Court enter an order:

1.   Granting the Motion;

2.   Approving the Agreement;

3.   Authorizing the Trustee to take any and all actions necessary to effectuate and enforce the Agreement;

4.   Authorizing the Trustee to liquidate securities and investments in the Merrill Lynch accounts to fund any and all payments to the Judgment Creditor under the Agreement; and

5.   Granting such further relief as the Court deems just and proper.

Dated: May 12, 2026                                    TODD A. FREALY, CHAPTER 11 TRUSTEE

By:   _/s/ Krikor J. Meshefejian_
          KRIKOR J. MESHEFEJIAN
          LEVENE, NEALE, BENDER, YOO
             & GOLUBCHIK L.L.P.
          Counsel for Chapter 11 Trustee

---

[3] Costs and commissions in connection with the sale of stocks is 1.5%, and costs and commissions in connection with the sale of commodities is 1%. There is no cost or commission in connection with the sale of mutual funds.

16

**DECLARATION OF TODD A. FREALY**

I, Todd A. Frealy, declare as follows:

1.       I am a partner of Levene, Neale, Bender, Yoo & Golubchik L.L.P. and the appointed chapter 11 trustee of the bankruptcy estate of Dedication & Everlasting Love To Animals dba D.E.L.T.A. Rescue (the "Debtor").  I make this Declaration in support of the attached motion (the "Motion"). I have personal knowledge of the facts set forth herein, and could and would testify as to such facts if requested to do so, unless otherwise indicated.  Capitalized terms not otherwise defined in this Declaration have the same meaning provided to such terms in the Motion.

2.       The Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code on May 9, 2025 (the "Petition Date").  On May 16, 2025, (1) the Court ordered the appointment of a chapter 11 trustee; (2) the Office of United States Trustee appointed me as the Trustee; and (3) the Court entered an order approving my appointment as the Trustee.

3.       The Debtor is a non-profit organization that operates an animal rescue facility located in Acton, California (and the Debtor may have similar operations in other locations either owned or rented by the Debtor).  The Debtor advertises that it is "the largest 'No Kill, Care-for-Life,' Animal Sanctuary of its kind in the world. *See* https://www.deltarescue.org.

4.       Virtually all of the Debtor's revenue appears to derive from donations made to the Debtor by third parties.  The Debtor also appears to be generating revenue in the form of dividends from investments in various securities.  The Debtor receives potentially hundreds of thousands of dollars of donations per month.  As of April 30, 2026, the Debtor's investment accounts with Merrill Lynch were holding approximately $14,498,290 million in securities investments (though that value may fluctuate depending on market conditions and investment performance).  Additionally, my investigation has revealed that the Debtor owns a number of pieces of real estate, which appear to be unencumbered (except potentially by a judgment lien).

5.       I understand that the Debtor filed this bankruptcy case as a result of a judgment obtained by a former employee of the Debtor – Adriana Duarte Valentines (the "Judgment Creditor") – against the Debtor, in the amended amount of $2,896,952, entered on March 19, 2025, and collection efforts thereon

17

by the Judgment Creditor. Additionally, the Judgment Creditor's state court counsel filed, prior to the Petition Date, a motion for attorney's fees and costs, requesting an attorney fee and cost award of more than $4 million. Prior to the Petition Date, on March 31, 2025, the Judgment Creditor filed a Notice of Judgment Lien with the California Secretary of State, and on April 28, 2025, the State Court issued a writ of execution in favor of the Judgment Creditor, in the amount of $2,925,564.68. Thereafter, on or around May 2, 2025, notices of levy appeared to have been served on various financial institutions, including U.S. Bank and Merrill Lynch.

6.      The creditor body in this case other than the Judgment Creditor, is comprised primarily of vendors, independent contractors, and service providers whose claims are for goods and services provided immediately before the Petition Date, but whose claims were not paid as a result of freezes placed on the Debtor's bank accounts due to either the Judgment Creditor's collection efforts or the Debtor's bankruptcy filing, or a combination of both, and certain state agencies. The total amount of claims other than the Judgment Creditor's claims that were scheduled by the Debtor or asserted in filed proofs of claim equals approximately $470,000.

7.      This estate appears to be a solvent estate, and I continue to manage and operate the Debtor's animal rescue facility with the assistance of the Debtor's employees, including the Debtor's Secretary Erica Grillo. Animals continue to receive care and the estate continues to receive donations for the time being, though as I have discussed in prior filings, donations have trended downward over the past numerous months. Additionally, on March 3, 2026, a criminal complaint was filed against the Debtor's principle Leo Grillo in the United States District Court for the Central District of California, Case No. 2:26-cr-00146-GW, under 18 U.S.C. § 1201(d), for the attempting kidnapping of the Judgment Creditor. This shocking news has resulted in the confinement of Mr. Grillo who remains in custody pending his criminal trial, which is presently set to commence on October 27, 2026. Such events, which have been highly publicized (https://www.latimes.com/california/story/2026-03-04/nonprofit-owed-millions-alleged-kidnapping-plot). Nevertheless, the estate continues to remain solvent as a result of the significant investments held by the estate, which as of April 30, 2026 had a value of approximately $14,498,290.

18

8.      In connection with the Debtor's pre-petition appeal of the Judgment Creditor's amended judgment, after the Petition Date, I filed an application to employ the law firm of Kaufman Dolowich LLP ("Appellate Counsel") to serve as the estate's appellate counsel in connection with the pending appeal of the judgment obtained by the Judgment Creditor.  Appellate Counsel has provided to me its analysis of the merits of the appeal.

9.      On September 19, 2025, the Judgment Creditor filed a proof of claim, designated as Claim 6-1 on the Bankruptcy Court's claim register, asserting a secured claim in the amount of $3,041,402.76, the basis of which is the judgment (the "Judgment Claim").

10.      Also on September 19, 2025, the Judgment Creditor filed a proof of claim, designated as Claim 7-1 on the Bankruptcy Court's claim register, asserting a general unsecured claim in the amount of $4,259,719.92, the basis of which is the Fee Motion (the "Attorney Fee Claim" and together with the Judgment Claim, the "Alleged Claims").

11.      On March 2, 2016, the Judgment Creditor and I entered into that certain *Stipulation Between Chapter 11 Trustee And Judgment Creditor Adriana Duarte Valentines To Appoint The Honorable Robert N. Kwan As Mediator For Resolution Of Judgment Creditor's Claims* [Bankruptcy Case docket number 219], and on March 4, 2026, the Bankruptcy Court entered that certain *Order Assigning Matter To Mediation Program And Appointing Mediator And Alternate Mediator* [Bankruptcy Case docket number 226].

12.      I have evaluated the state court proceedings that led to the judgment, the issues and disputes relevant to the appeal, and the Attorney Fee Claim, and the status of this case, in connection with participating in the mediation and reaching a settlement with the Judgment Creditor.  In the state court proceedings, the special verdict form attached to the judgment shows that the 12-person jury unanimously ruled against the Debtor on the overwhelming majority of the 66 questions submitted to the jury.  On November 4, 2024, the jury returned a verdict for the Judgment Creditor with a 12-0 vote on nearly every question on the form.  The jury ruled 0-12 against the Debtor on its same decision affirmative defense.  The only issues on which the Debtor prevailed by a 2-10 vote were failure to grant pregnancy disability leave and failure to reinstate from pregnancy disability leave.

13.	The original Phase 1 verdict was for $180,950.00 in economic damages, $5,000,000.00 in past noneconomic damages, and $500,000.00 in future noneconomic monetary damages, for total monetary damages of $5,680,950.00. The trial court denied in part and granted in part a motion for new trial unless the Judgment Creditor agreed to a reduction in excessive noneconomic damages from $5.6 million to $1,7 million. On the same form, the jury found that Leo Grillo (the Debtor's principal) engaged in conduct with malice, oppressions, or fraud and was acting on behalf of the Debtor. This triggered a Phase 2 punitive damages trial. On November 5, 2024, the jury returned a verdict of $1 million in punitive damages.

14.	In the state court proceedings, the Judgment Creditor claimed that the Debtor engaged in various forms of discrimination, including sex, gender, pregnancy and/or national origin discrimination. The Judgment Creditor prevailed against the Debtor in connection with such claims, and it appears to me that the Judgment Creditor prevailed, at least in part, as a result of certain statements made by Leo Grillo during his deposition, which the Debtor unsuccessfully sought to exclude from evidence as irrelevant and unduly prejudicial, including, insinuating that because the Judgment Creditor is a woman, she should already know that a Cesarean section will result in a hospital stay, referring to the Judgment Creditor as a "lettuce picker" and a "bimbo" and making statements such as "I don't speak Mexican." While Mr. Grillo disagrees with the manner in which the context and intent of his statements was presented to the jury, my analysis of the issues on appeal is that the appellate court is unlikely to reverse evidentiary rulings allowing such deposition testimony to be presented at trial that Mr. Grillo's deposition testimony was likely properly admitted and likely led the jury to weigh the evidence in favor of the Judgment Creditor.

15.	The Debtor's position at trial was that the Debtor properly terminated the Judgment Creditor's employment in good faith for two legitimate reasons. First, the Debtor claimed that the Judgment Creditor stole pet supplies from the Debtor, and second, the Debtor claimed that the Judgment Creditor deliberately concealed her pregnancy from the Debtor, asked for time off for a short hospital stay, and belatedly revealed her pregnancy to the Debtor only after the fact because she ended up having an unexpected Caesarean section and needed more time off. However, no hard evidence of theft appears to have been presented, apart from Mr. Grillo's suspicions, so citing that as a basis for termination likely looked to the jury like the Debtor was searching for a pretext to terminate the Judgment Creditor.

20

Additionally, the Debtor appears to have been unable to provide any evidence that the Judgment Creditor was obligated to report a pregnancy to the Debtor. My analysis is that the estate faces a difficult battle attempting to prove on appeal that the jury verdict was based on bias and unfairness in the trial proceedings or that there was an error at the trial court likely to result in a reversal of the judgment.

16. I have also evaluated the attorney fee claims of the Judgment Creditor and believe that it is likely that the attorneys' fees would be reduced in connection with liquidation of the Attorney Fee Claim of the Judgment Creditor. To the extent we did not settle, I would object to the Attorney Fee Claim, and there would likely be a dispute regarding which court should liquidate that claim, and the allowed amount of that claim. However, such litigation would likely result in additional costs and delay in the administration of this case and there would be the risk that the estate would not prevail in such disputes. In any event, the settlement reached with the Judgment Creditor takes into account a reduction of the alleged claims of the Judgment Creditor, from a total of $7.3 million to $5.5 million, which I believe takes into account the low probability of success in the appeal and the higher probability of successfully reducing the attorneys' fees claimed by the Judgment Creditor.

17. On April 13, 2026, the Judgment Creditor and I participated in a mediation with the Honorable Robert N. Kwan serving as mediator. The Debtor's insurance carrier Nonprofits Insurance Alliance of California also attended and participated in the mediation.

18. Considering the risks and costs involved in continued litigation (including those concerning the Alleged Claims, the Bankruptcy Case, the Fee Motion and the Appeal), we have agreed to resolve all disputes between the estate and the Judgment Creditor, including, without limitation, the Alleged Claims that were, or could have been, asserted in the Valentines Lawsuit, the appeal, or the bankruptcy case, on terms mutually acceptable to each party pursuant to a mediator's proposal accepted by both parties on April 13, 2026.

19. The Agreement is the product of intensive, arms-length negotiations by and between the Judgment Creditor and me, pursuant to a Court-ordered mediation between the Judgment Creditor and me which occurred on April 13, 2026, with the Honorable Robert F. Kwan, United States Bankruptcy Judge (Ret.), serving as the mediator. The Agreement constitutes, in my opinion and business judgment, the most

21

effective and efficient manner of resolving the largest and most significant claim against the Debtor's estate, which, ultimately, will lead to and result in the payment of all allowed claims in full in this case, and facilitate the ongoing viability of the Debtor's non-profit operations. The Agreement will resolve all pending disputes between the Judgment Creditor and the estate, including the appeal of the Judgment Creditor's judgment and issues and disputes pertaining to the allowance and liquidation of the Judgment Creditor's judgment claim and attorneys' fees claim. Pursuant to the Agreement, the asserted claims of the Judgment Creditor, in the amount of more than $7.3 million (and growing due to the incurrence of additional interest on the judgment claim at a rate of 10% per annum, and potentially additional attorneys' fees and costs), will be satisfied in full by payment of $5.5 million in total, $726,000 of which will be funded by the Debtor's insurer Nonprofits Insurance Alliance of California ("NIAC") (which has agreed to fund such amount and which amount NIAC will pay directly to the estate).

20.     I believe that under the circumstances, the Agreement places this estate on a path to ensuring that all creditors' claims are satisfied without continuing to embroil this estate in time consuming appeal litigation that appears to have little chance of success, and that leaves the estate with sufficient assets to continue to be able to fund operations and continue to provide for the rescued animals in the estate's care.

21.     Subsequent to the mediation, I negotiated and executed that certain *Settlement And Release Agreement* (the "Agreement"), a true and correct copy of which is attached as **Exhibit 1** to this Declaration.

22.     In order to fund payments to the Judgment Creditor under the terms of the Agreement, I will need authority to liquidate additional securities and investments in the estate's two Merrill Lynch investment accounts. Pursuant to the Motion, I seek authority to liquidate sufficient securities to make all required payments to the Judgment Creditor under the Agreement (to the extent the Agreement is approved by the Court). I have commenced discussions with Merrill Lynch personnel to develop a potential securities liquidation strategy to ensure that the estate can liquidate sufficient investments to raise at least $3.3 million (net, after costs and commissions[4]) in connection with the initial $4 million payment to be

---

[4] Costs and commissions in connection with the sale of stocks is 1.5%, and costs and commissions in connection with the sale of commodities is 1%. There is no cost or commission in connection with the sale of mutual funds.

made to the Judgment Creditor under the terms of the Agreement. I am seeking Court authority to liquidate securities/investments in order to fund all payments under the Agreement.

23.    The Agreement will resolve the disputes and claims that led to the filing of this bankruptcy case and will ultimately lead to the payment in full of all allowed claims against the estate while preserving sufficient assets to ensure that operations and the care for and safety of rescued animals continue for the foreseeable future. As discussed above, I have analyzed the merits of the appeal with the assistance of Appellate Counsel and I do not believe that the estate is likely to prevail on appeal. While I do believe that the Attorney Fee Claim is objectionable and that there are reasons why the Attorney Fee Claim should be reduced, the Agreement, and the reduction of the Alleged Claims, from $7.3 million to $5.5 million (with $726,000 to be paid by NIAC), fairly and reasonably takes into account the probability of success in the appeal (low probability) and the probability of reduction of the Attorney Fee Claim (medium to high probability of a reduction, though low probability of a reduction in excess of $1 million).

24.    Moreover, if there was a probability of success in the appeal, the most likely result would be a retrial, which could nevertheless expose the estate to a large claim by the Judgment Creditor that would be required to be paid, at least in part, by the estate. Moreover, such an outcome would severely delay the resolution of the bankruptcy proceedings and the payment of other creditors' claims. Given the uncertainty and unlikelihood of success in connection with the appeal, and the material discount of the Alleged Claims, I submit that the potential success in litigation is outweighed by the certainty the Agreement provides in terms of the estate's total exposure to the Judgment Creditor's claims and the efficient resolution of this case. I believe that proceeding with litigation with the Judgment Creditor is unlikely to achieve an actual superior result to what is provided in the Agreement.

25.    The estate is not seeking to collect or recover any money from the Judgment Creditor. However, it is important to note that the Agreement does not result in a release of any claims of the estate against the Debtor's trial counsel or the Debtor's insurer, as all such claims are preserved.

26.    The appeal is complex and involves events that occurred many years ago. While the costs of the appeal are required to be funded by NIAC (without a reduction in policy limits), the administration of the appeal and my involvement and oversight with respect to the appeal and litigation regarding the

unliquidated Attorney Fee Claim will cause expense, inconvenience and delay in connection with the administration of this bankruptcy case. Absent the Agreement, I would would be required to continue to oversee the appeal, and expend resources objecting to the Attorney Fee Claim. Though I recognize that the costs of Appellate Counsel, and potentially the costs of a new trial in the state court would be borne by NIAC and not the estate, the time delay in resolving the Alleged Claims could be significant, and, the I would be required to administer the estate while such matters remain unresolved, at a cost to the estate. I believe that the delay and inconvenience inherent in continued litigation with the Judgment Creditor weighs in favor of approval of the Agreement.

27.    The paramount interest of the creditors is best served by the Agreement, since the Agreement will pave the way toward payment of allowed claims in full while ensuring that the Debtor retains sufficient assets to continue its operations for the foreseeable future. My review and analysis of all of the facts of this case, coupled with his intensive discussions with parties in interest and their counsel, brought me to the conclusion that it would be a mistake for me to fail to consider alternatives to litigation and to fail to consider a resolution with the Judgment Creditor, who obtained a judgment against the Debtor pursuant to a 12-0 jury verdict. I engaged in good faith mediation with the Honorable Robert F. Kwan serving as mediator and reached an agreement with the largest creditor of this estate after intensive negotiations in which I was able to significantly reduce the Alleged Claims of the Judgment Creditor, by nearly $2 million.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed this 12th day of May, 2026, in Pasadena, California.

_____
TODD A. FREALY

28

**Exhibit 1**

## SETTLEMENT AND RELEASE AGREEMENT

This Settlement and Release Agreement (the "Agreement") is hereby entered into as of April 13, 2026, by and between (1) Todd A. Frealy, solely in his capacity as the Chapter 11 Trustee (the "Trustee" or "Plaintiff") for the bankruptcy estate (the "Estate") of Debtor Dedication & Everlasting Love to Animals d/b/a D.E.L.T.A Rescue ( "DELTA" or the "Debtor"), on the one hand, and Adriana Duarte Valentines ("Valentines" or the "Judgment Creditor") on the other hand. Trustee and Judgment Creditor will at times hereinafter be referred to collectively as the "Parties," and individually as a "Party."

## RECITALS

A.     Judgment Creditor is a former employee of Debtor. Judgment Creditor was terminated in February of 2020. On January 12, 2021 Judgment Creditor filed a lawsuit for employment related claims, based on wage and hour claims, for wrongful termination, and for disability discrimination, in the LA Superior Court ("State Court"), captioned *Valentines vs. Debtor Dedication & Everlasting Love to Animals d/b/a D.E.L.T.A Rescue* assigned Case No. 21STCV01322 (the "Valentines Lawsuit").

B.     The Valentines Lawsuit was litigated through jury trial, and to verdict. The original judgment in favor of Judgment Creditor against Debtor was in the amount of $6,680,950, with $1,000,000 of that consisting of punitive damages. The judgment was later reduced to $2,896,952 by the State Court, after Debtor objected to the original amount in the jury's verdict.

C.     Post-judgment, Judgment Creditor filed a motion for attorney's fees and costs (the "Fee Motion"). The Fees Motion remains pending.

D.     Debtor filed an appeal of the judgment in the Valentines Lawsuit before the Second District Court of Appeals, which appeal was assigned Case No. B345103 (the "Appeal"). The Appeal remains pending.

E.     On May 9, 2025 (the "Petition Date"), the Debtor filed a Voluntary Petition under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Central District of California ("Bankruptcy Court"), which was assigned Bankruptcy Case No. 2:25-bk-13881-NB (the "Bankruptcy Case").

F.     On May 16, 2025, the Bankruptcy Court ordered the Office of the United States Trustee to appoint a Chapter 11 trustee. Thereafter, Todd A. Frealy being duly qualified, was appointed as, and presently is, the acting Chapter 11 trustee (the "Trustee") of the Debtor's bankruptcy estate.

G.     On September 19, 2025, the Judgment Creditor filed a proof of claim, designated as Claim 6-1 on the Bankruptcy Court's claim register, asserting a secured claim in the amount of $3,041,402.76, the basis of which is the judgment (the "Judgment Claim").

H.     Also on September 19, 2025, the Judgment Creditor filed a proof of claim, designated as Claim 7-1 on the Bankruptcy Court's claim register, asserting a general unsecured

*In re Dedication and Everlasting Love of Animals*
Settlement Agreement
Valentines vs. D.E.L.T.A Rescue

claim in the amount of $4,259,719.92, the basis of which is the Fee Motion (the "Attorney Fee Claim" and together with the Judgment Claim, the "Alleged Claims").

I.      On March 2, 2016, the Trustee and the Judgment Creditor entered into that certain *Stipulation Between Chapter 11 Trustee And Judgment Creditor Adriana Duarte Valentines To Appoint The Honorable Robert N. Kwan As Mediator For Resolution Of Judgment Creditor's Claims* [Bankruptcy Case docket number 219], and on March 4, 2026, the Bankruptcy Court entered that certain *Order Assigning Matter To Mediation Program And Appointing Mediator And Alternate Mediator* [Bankruptcy Case docket number 226].

J.      On April 13, 2026, the Trustee and the Judgment Creditor participated in a mediation with the Honorable Robert N. Kwan serving as mediator. The Debtor's insurance carrier Nonprofits Insurance Alliance of California also attended and participated in the mediation.

K.      Considering the risks and costs involved in continued litigation (including those concerning the Alleged Claims, the Bankruptcy Case, the Fee Motion and the Appeal), the Trustee and the Judgment Creditor have agreed to resolve all disputes between the Estate and the Judgment Creditor, including, without limitation, the Alleged Claims that were, or could have been, asserted in the Valentines Lawsuit, the Appeal, or the Bankruptcy Case, on terms mutually acceptable to each Party pursuant to a mediator's proposal accepted by both Parties on April 13, 2026.

NOW, THEREFORE, in consideration of the promises, covenants, warranties, and representations set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and mutually intending to be bound, the Parties agree as follows:

## TERMS

1.      **Purpose of Agreement.** This Agreement is entered into in good faith for the purpose of settling all disputes between the Judgment Creditor and the Debtor with respect to all claims brought or that could have been brought in the Valentines Lawsuit, the Bankruptcy Case, or the Appeal, including, without limitation, the Alleged Claims, and to also resolve any other remaining disputes relating to the Valentines Lawsuit or the Bankruptcy Case, including the Fee Motion and the Appeal.

2.      **Condition to Effectiveness of Agreement.** This Agreement is subject to the approval of the Bankruptcy Court and shall not be effective until entry by the Bankruptcy Court of a final, non-appealable order (the "Final Order"), with the date on which there is a Final Order being the effective date of this Agreement (the "Effective Date"). The Trustee shall file with the Court a motion pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure in the Bankruptcy Case for an order approving this Agreement. In the event that the Court does not approve this Agreement pursuant to a Final Order, except as provided for herein, this Agreement shall be null and void and of no force or effect. In the event that any party timely perfects an appeal of the entry of the Bankruptcy Court's order approving this settlement, the Effective Date shall be

*In re Dedication and Everlasting Love of Animals*
Settlement Agreement
Valentines vs. D.E.L.T.A Rescue

tolled until ten (10) days after such appeal is resolved and the appealed order becomes a Final Order.

3.     **Initial Payment By Debtor's Estate To Judgment Creditor.**   In full settlement and satisfaction of the Alleged Claims, and any other claims and causes of action of the Judgment Creditor against the Estate, the Estate shall pay to the Judgment Creditor in accordance with this Agreement and subject to the entry of a Final Order, payments totaling the sum of five-million five-hundred thousand dollars ($5,500,000) (the "Settlement Amount"), as follows: An initial payment shall be made by the Estate to the Judgment Creditor in the amount of four-million dollars ($4,000,000) (the "Initial Payment") within 10 days after the Effective Date. The Initial Payment shall be made by wire to Levin & Nalbandyan, LLP Client Trust Account. Wire instructions shall be provided to counsel for the Estate by counsel for Judgment Creditor in advance of the payment due date.   The Debtor's insurer, Nonprofits Insurance Alliance of California ("NIAC"), who has been tendering defense costs for the Debtor in connection with the Valentines Lawsuit, shall pay to the Estate the remaining policy limits of seven-hundred twenty-six thousand dollars ($726,000) within 30 days of the entry of a Final Order. If the Effective Date is tolled due to an appeal of the Bankruptcy Court's order approving this settlement, then the Initial Payment amount shall accrue simple interest in the amount of 5% per annum until the order becomes a Final Order.   If any interest on the Initial Payment is earned due to an appeal, the Trustee and Judgment Creditor shall meet and confer to confirm the interest amount and that interest shall be added to the Initial Payment made by the Estate to the Judgment Creditor as and to the extent the appealed order becomes a Final Order.

4.     **Subsequent Installment Payments By Debtor's Estate To Judgment Creditor.**   The remaining one-million, five-hundred thousand dollars ($1,500,000) of the Settlement Amount shall be paid by the Estate to the Judgment Creditor by wire to Levin & Nalbandyan, LLP Client Trust Account in eight (8) quarterly installments (the "Installment Payments"), provided, however, that the Trustee may cause the Installment Payments to be paid earlier without any pre-payment penalty. Wire instructions shall be provided to counsel for the Estate by counsel for Judgment Creditor in advance of the due date. Each of the Installment Payments shall total at least one-hundred eighty-seven thousand, five-hundred dollars ($187,500).   The Installment Payments shall commence on the 90th day after the Initial Payment is made and shall continue quarterly thereafter until the entire Settlement Amount is paid to the Judgment Creditor. Notwithstanding any of the above, The Trustee shall have the right, in his sole discretion, to pay any remaining portion of the Settlement Amount to Judgment Creditor at any time after the Effective Date without any prepayment penalty.   Any plan of reorganization proposed by the Trustee shall incorporate the terms of this Agreement and shall provide for the treatment of the Alleged Claims of the Judgment Creditor as set forth in this Agreement, and Judgment Creditor shall support and vote in favor of any such plan of reorganization proposed by the Trustee, provided, however, that nothing set forth in this Agreement shall require the Trustee to propose or confirm a plan of reorganization in the Bankruptcy Case. The Trustee may place the entirety of the Alleged Claims in a single class under any such plan, or, alternatively, the Trustee may place the Judgment Claim in a separate, secured creditor, class, and the Attorney Fee Claim in a class with other general unsecured claims.

*In re Dedication and Everlasting Love of Animals*
Settlement Agreement
Valentines vs. D.E.L.T.A Rescue

**5.      Payment Instructions.** Every payment made toward the Settlement Payment shall be in U.S. Dollars and made in good and immediately available funds. Every payment made toward the Settlement Amount shall be made by wire as stated in Paragraphs 3 and 4 of this Agreement.

**6.      Default, Notice and Cure.** The Estate shall have a fourteen (14) day grace period ("Grace Period") after the due date of each Installment Payment within which it may make the above referenced Installment Payment prior to the Judgment Creditor sending a notice of default ("NOD") letter via email and regular mail to the Debtor and to the Trustee and his counsel. If after the Grace Period the Estate has failed to make the Installment Payment noted above, the Estate shall be considered to be in default. Notwithstanding any default, the Estate shall have the right to cure any default by paying the first delinquent payment and any subsequent payments that have come due in full without acceleration. If the default remains uncured after the NOD, the unpaid and past due Installment Payment shall begin to earn interest as of the date of the NOD at the rate of 10% per annum, simple interest, until the Settlement Amount is fully paid (with interest).

**7.      Cooperation with the Trustee.** Judgment Creditor and her counsel represent and warrant that they will continue to, in general, cooperate with the Trustee and the Estate in a reasonable manner.

**8.      Dismissal of Proceedings.** Within five (5) business days following the Judgment Creditor's receipt of the Initial Payment, the Judgment Creditor shall file with all appropriate Courts a stipulation to dismiss the Appeal with prejudice. Within ten (10) business days following Judgment Creditor's receipt of the final Installment Payment as set forth above, Judgment Creditor shall file with all appropriate Courts an Acknowledgment of Satisfaction of Judgment. To the extent applicable, Judgment Creditor shall also cause an Acknowledgment of Satisfaction of Judgment to be recorded with any recording authority where Judgment Creditor recorded a notice of judgment, writ of execution, an abstract of judgment, and/or any other similar document evidencing the judgment obtained by Judgment Creditor in the Valentines Lawsuit. Upon full satisfaction of the Settlement Amount, Judgment Creditor shall be deemed to have released any and all liens, encumbrances and security interests against any and all property of the Debtor and its Estate.

**9.      Releases.**

9.1.    Except as otherwise provided in this Agreement, upon execution of this Agreement and payment of the Settlement Amount to the Judgment Creditor, the Judgment Creditor, on behalf of herself and her respective predecessors, successors, heirs, and assigns, does hereby release, remise, and discharge the Trustee, the Debtor, the Estate, and all of their respective donors, members, shareholders, directors, officers, employees, agents, attorneys, successors, and assigns from any and all claims, demands, debts, liabilities, contracts, obligations, accounts, torts, causes of action, or claims for relief arising from or related to the Valentines Lawsuit, the Fee Motion or the Bankruptcy Case, whether known or unknown or suspected or unsuspected by these releasing parties, or any of them, which these same releasing parties may have, claim to have, or have at anytime heretofore had or claimed to have had, or

*In re Dedication and Everlasting Love of Animals*
Settlement Agreement
Valentines vs. D.E.L.T.A Rescue

that may hereafter accrue against any of these released parties by reason of any transaction, occurrence, act, or omission prior to the execution of this Agreement. For the avoidance of doubt, this release does not extend to any claims Judgment Creditor may have against any individuals by virtue of any criminal actions those individuals may have taken against Judgment Creditor whether or not any individual purports to have done so on behalf of the Debtor or the Estate.

9.2.    The Trustee and the Estate on behalf of themselves and their successors and assigns, do hereby release, remise, and discharge the Judgment Creditor and her successors and assigns, from any and all claims, demands, debts, liabilities, contracts, obligations, accounts, torts, causes of action, or claims for relief arising from or related to the Valentines Lawsuit and the Bankruptcy Case, whether known or unknown or suspected or unsuspected by these releasing parties, or any of them, which these same releasing parties may have, claim to have, or have at anytime heretofore had or claimed to have had, or that may hereafter accrue against any of these released parties by reason of any transaction, occurrence, act, or omission execution of this Agreement.

9.3.    Each Party expressly waives and relinquishes any and all rights and benefits under California Civil Code section 1542, which provides:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

Each Party acknowledges that it may hereafter discover facts different from or in addition to those it now knows or believes to be true with respect to the claims released herein, and expressly agrees that this release shall be and remain effective in all respects notwithstanding the discovery of any such different or additional facts.

9.4.    The Parties acknowledge and agree that none of the releases contained in this Agreement shall extend to any insurers of any of the Parties or to any malpractice claims that the Estate may hold against its counsel in the Valentines Lawsuit. For the avoidance of doubt, the releases specifically do not extend to Debtor's insurer, NIAC, and any and all claims and causes of action of the Estate against NIAC or the Debtor's counsel in the Valentines Lawsuit are expressly preserved

## 10.    Miscellaneous.

10.1.    Entire Agreement. This Agreement and the exhibits hereto constitute the entire agreement between the Parties with regard to the subject matter set forth herein and supersedes all prior and contemporaneous negotiations, draft agreements, agreements, understandings, and representations between the Parties, oral or written, concerning the subject matter hereof. Each

*In re Dedication and Everlasting Love of Animals*
Settlement Agreement
Valentines vs. D.E.L.T.A Rescue

Party hereto further covenants that the consideration recited herein is the only consideration for entering into this Agreement, and that no promises or representations of other or further consideration have been made by any person.

10.2.    No Oral Modification.  No provision hereof may be waived, modified or altered except in a writing executed by the Parties.

10.3.    Voluntary Agreement.  The Parties hereto, and each of them, further represent and declare that they have carefully read this Agreement and know the contents thereof and that they sign the same freely and voluntarily.

10.4.    Independent Advice of Counsel.  The Parties hereto, and each of them, represent and declare that in executing this Agreement, they rely solely upon their own judgment, belief and knowledge, and the advice and recommendations of their own independently selected counsel, concerning the nature, extent, and duration of their rights and claims, and that they have not been influenced to any extent whatsoever in executing the same by any representations or statements covering any matters made by any of the Parties hereto or by any person representing them or any of them.  Each of the Parties hereto covenants that it has not entered into this Agreement as a result of any representation, agreement, inducement or coercion, except to the extent specifically provided herein.

10.5.    Geographic Scope.  This Agreement will bind and benefit the Parties and their respective heirs, representatives, successors and assigns worldwide.

10.6.    Governing Law.  This Agreement shall be deemed to have been entered into and shall be construed and enforced in accordance with the laws of the State of California.  The Bankruptcy Court shall have jurisdiction to interpret and enforce this Agreement and to resolve any disputes between the Parties in connection with or related to this Agreement.

10.7.    Attorney Fees and Costs.  In the event any suit, action, hearing, or other proceeding is instituted to enforce or interpret any portion of this Agreement, the prevailing party shall be entitled to recovery of its costs, including its attorney's fees.

10.8.    Captions.  The captions of paragraphs contained in this Agreement are for reference only and are not to be construed in any way as a part of this Agreement.

10.9.    Notices.  Any notice required or contemplated by this Agreement shall be given in writing by e-mail and Federal Express, Next Day Delivery, (or other nationally recognized overnight carrier).  Notice shall be given at the following addresses (which any Party may change at any time by written notice), and shall be deemed completed as of the date given:

To Trustee:            Levene, Neale, Bender, Yoo & Golubchik L.L.P.
                       Attn: Todd A. Frealy
                       Attn: Krikor J. Meshefejian
                       Attn: Joseph Rothberg
                       2818 La Cienega Avenue

*In re Dedication and Everlasting Love of Animals*
Settlement Agreement
Valentines vs. D.E.L.T.A Rescue

<table>
<tr><td></td><td>Los Angeles, CA 90034<br>Email: taf@LNBYG.com<br>Email: kjm@LNBYG.com<br>Emali: jmr@LNBYG.com</td></tr>
<tr><td>To Debtor:</td><td>Dedication and Everlasting Love of Animals<br>Attn: Erica Grillo<br>P.O. Box 9<br>Glendale, CA 91209<br>Email: ericagrillo@icloud.com</td></tr>
<tr><td>To Valentines:</td><td>Manasserian Law, APC<br>Attn: Armen Manasserian<br>35 Hugus Alley, Suite 210<br>Pasadena, CA 91103<br>Email: armen@ml-apc.com</td></tr>
<tr><td></td><td>Levin & Nalbandyan LLP<br>Attn: Jacob Nalbandyan<br>Attn: Viridiana E. Aceves<br>11132 Ventura Blvd<br>Studio City, CA 91604<br>Email: jnalbandyan@lnnlaw.com<br>vaceves@lnnlaw.com<br>serviceemp@lnnlaw.com</td></tr>
</table>

10.10. <u>Costs</u>. Each Party will bear its own costs, expenses, and attorneys' fees that it has heretofore incurred in connection with or arising out of the matters set forth in the Recitals hereinabove, and the matters and claims released hereunder.

10.11. <u>Binding Effect</u>. This Agreement shall be binding upon and inure to the benefit of the Parties hereto and to their respective employees, agents, shareholders, officers, directors, partners, subsidiaries, affiliates, licensees, heirs, representatives, successors and assigns and shall continue in force forever unless earlier terminated by a writing signed by both Parties, or as otherwise set forth herein.

10.12. <u>Arm's Length Negotiation</u>. The terms of this Agreement have been negotiated at arm's length among sophisticated Parties who were both represented by attorneys admitted to practice law in the State of California. As a result, the rule of "interpretation against the draftsman" shall not apply in any dispute over interpretation of the terms of this Agreement.

10.13. <u>Ancillary Agreements, Further Assurances</u>. The parties to this Agreement agree to execute such other documents and to perform such acts as may be reasonably necessary to carry out the terms and intent of this Agreement.

*In re Dedication and Everlasting Love of Animals*
Settlement Agreement
Valentines vs. D.E.L.T.A Rescue

10.14. <u>Severability</u>.  The invalidity, illegality or unenforceability of any provisions of this Assignment shall not affect the continuation in force of the remainder of this Assignment.

10.15. <u>Construction</u>.  No Party shall be deemed the drafter of this Agreement and this Agreement will not be construed more strictly against any one Party. This Agreement has been jointly negotiated and drafted. The language of this Agreement shall be construed as a whole according to its fair meaning, and not strictly for or against any of the Parties.

10.16. <u>No Waiver</u>.  No breach of any provision hereof can be waived unless in writing. Waiver of any one breach of any provision hereof shall not be deemed to be a waiver of any other breach of the same on any other provision hereof.

10.17. <u>Knowledge and Authority</u>.  Each of the Parties hereto warrants and represents that it has (a) voluntarily and knowingly made this Agreement, (b) read this Agreement and understands all of its terms, (c) the authority to make this Agreement, and (d) made this Agreement, with full knowledge of its significance, without relying upon any warranties or representations, except those set forth herein, by any of the other Parties or their attorneys.  Each person who signs this Agreement represents and warrants that he or she has the authority and capacity to act on behalf of the Party for whom they are signing and to bind the Party and all who might claim through it to the terms of this Agreement.

10.18. <u>No Admission of Liability</u>.  This Agreement is a compromise.  It is not an admission by any Party of any wrongful conduct or liability.

10.19. <u>Interpretation</u>.  When necessary, all terms used in the singular shall apply to the plural, the masculine shall include the feminine, and all terms used in the plural shall apply to the singular.

*[This Space Intentionally Left Blank]*

*In re Dedication and Everlasting Love of Animals*
Settlement Agreement
Valentines vs. D.E.L.T.A Rescue

      10.20. <u>Facsimile / Counterparts</u>.   This Agreement may be executed in two or more counterparts, each of which shall be an original and which together shall constitute one and the same instrument, and a facsimile or otherwise electronically transmitted signature (such as by pdf transmitted by email) shall be deemed to constitute an original signature.

**AGREED TO AND ACCEPTED BY:**

**TRUSTEE**

DATED: 4/29/2026

TODD A. FREALY
Solely in his capacity as Chapter 11 Trustee
for the Estate of the Debtor

**JUDGMENT CREDITOR**

DATED:  04/28/2023

Adriana Duartes Valentines

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:  2818 La Cienega Avenue, Los Angeles, CA 90034

A true and correct copy of the foregoing document entitled (*specify*): **Chapter 11 Trustee's Motion For Entry Of An Order: (I) Approving Compromise Of Controversies And Settlement Agreement Pursuant To Rule 9019 Of The Federal Rules Of Bankruptcy Procedure And (II) Authorizing Trustee To Liquidate Additional Investments In Order To Fund Settlement Payments; Memorandum Of Points And Authorities; Declaration Of Todd A. Frealy In Support Thereof** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1**.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On ***May 12, 2026*** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Michael Jay Berger     michael.berger@bankruptcypower.com, yathida.nipha@bankruptcypower.com;michael.berger@ecf.inforuptcy.com**
- **David K Eldan     David.Eldan@doj.ca.gov**
- **Todd A. Frealy (TR)     taftrustee@lnbyb.com, taf@trustesolutions.net**
- **Armen Manasserian     armen@ml-apc.com, jennifer@ml-apc.com,ruben@ml-apc.com**
- **Ron Maroko     ron.maroko@usdoj.gov**
- **Krikor J Meshefejian     kjm@lnbyg.com**
- **United States Trustee (LA)     ustpregion16.la.ecf@usdoj.gov**
- **Sharon Z. Weiss     sharon.weiss@bclplaw.com, raul.morales@bclplaw.com,sharon-weiss-7104@ecf.pacerpro.com**
- **David Welch     litigation@enso.law**
- **Lisa Wong     lisa@ml-apc.com**

**2.  SERVED BY UNITED STATES MAIL**:  On ***May 12, 2026,*** I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on ***May 12, 2026,*** I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| May 12, 2026 | Rebecka Merritt | */s/ Rebecka Merritt* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                **F 9013-3.1.PROOF.SERVICE**